**Edith Joan SELBY, Appellant,**

v.

**John Kirtly SELBY, Respondent.**

**No. WD 63099.**

Missouri Court of Appeals, Western District.

Oct. 12, 2004.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 23, 2004.

Susan Ford Robertson, Columbia, MO, for Appellant.

Michael P. Riley, Jefferson City, MO, for Respondent.

Before THOMAS H. NEWTON, P.J., HAROLD L. LOWENSTEIN and RONALD R. HOLLIGER, JJ.

THOMAS H. NEWTON, Presiding Judge.

Mr. John Selby and Ms. Edith Selby filed for divorce. When the trial court characterized the parties' property, it found that a 446–acre farm belonged solely to Mr. Selby. Ms. Selby appealed, claiming that either a portion of the farm was marital property and the trial court should have used the source of funds rule to determine how much was marital property, or that the entire farm had been transmuted into marital property. We find that the trial court misapplied the law and that the evidence did not support its decision because at least a portion of the farm was marital property. We reverse and remand with directions for the trial court to determine how much of the farm is marital property.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Mr. and Ms. Selby were married on June 4, 1993. They separated on April 7, 2002, and Ms. Selby filed for divorce on May 7, 2002. Trial was held on March 6, 2003. Both parties came into the marriage with extensive separate property and they accumulated more property during the

marriage. The only issue at trial was the division of property.

When they got married, Ms. Selby had her 401(k) and retirement plans from her prior job, a timeshare in Las Vegas, a house and a cabin—which were sold sometime around the marriage and the proceeds were used to buy a condominium in Arizona—and her furniture and a vehicle. Mr. Selby had some farmland and several businesses. He was also part of the Selby Farm Partnership, which was a partnership among him and his three siblings. The partnership bought and sold farmland. Mr. Selby had considerable debt at the time of the marriage. Ms. Selby claims that they used her 401(k) plan to obtain borrowing power; Mr. Selby claims that he was buying farms without her prior to the marriage.

Early in the marriage the parties established revocable trusts with each as the beneficiary of the other. These were created because both parties had children from prior marriages, and they wanted to provide for them after their deaths. Ms. Selby testified that she never had an understanding that the way that the property was divided between the trusts would affect the division of property if the parties were to divorce. Ms. Selby's understanding was that any joint property would be described in only one trust, generally Mr. Selby's, in order to save them money. Mr. Elton Fay (their local attorney) testified that he put Mr. Selby's property into his trust and put Ms. Selby's property into hers because both provided that whenever one of them died, the survivor got the benefit and then the principal would go to their respective children. Mr. Fay also testified that he did not know of any tax advantage that would be derived from any particular division of property between the trusts.

### Duplexes and Selby Dock Service

When the parties married, Mr. Selby was operating Selby Dock Service, Inc. at the Lake of the Ozarks. At that time, Ms. Selby took early retirement and moved out to the Lake to work at her husband's business full-time. They lived on property that was owned by the Dock Service, which paid all of the expenses. Mr. Selby drew an income from the business. Ms. Selby testified that while she ran the Dock Service, Mr. Selby was able to run a boat floater business.

After the marriage, a portion of the land owned by the Dock Service was surveyed off and two duplexes were built on it. Ms. Selby suggested building the duplexes and was more involved in the building and the leasing than Mr. Selby. Ms. Selby testified that they borrowed money to finance building the duplexes. She also testified that it was her understanding that the duplexes were titled in both of their names because they borrowed money on the duplexes in both their names. Mr. Selby testified that the duplexes were always in his name and that there was never a mortgage on them. He testified that the duplexes paid for themselves.[1] Ms. Selby presented a document that purported to be a statement of loan principal and interest and testified that the parties definitely had a loan on the duplexes and that her handwritten note on the document said that the duplexes were paid in full on October 27, 1999. Mr. Selby denied that there was a loan and did not identify the document. The duplexes were in Mr. Selby's trust before they were sold. At one point the trust stated that one duplex would go to Mr. Selby's children and the other would go to Ms. Selby's children, but that had changed by the time of the dissolution. Ms. Selby's name does not appear any-

---

**1.** He did not elaborate, but presumably they paid for themselves through rental income.

where in the chain of title. The duplexes were sold a few months before the divorce, realizing approximately $155,000 in equity. That money was being held in an escrow account pending the resolution of the divorce. Both parties claimed that they were entitled to those proceeds: Ms. Selby claimed a half interest and Mr. Selby claimed entitlement to all of the proceeds.

Subsequently, Mr. Selby sold the Dock Service to Ms. Selby's son, Scott Walker, for $126,000, which money went into the farmhouse that was built on the 446–acre farm. A portion of that purchase price came from Ms. Selby, who had given some money to each of her children, and the rest came from Mr. Walker. Ms. Selby claimed that the terms of the sale were not that favorable because there was an agreement that Mr. Walker would work at the Dock Service until Mr. Selby retired, which was over seven years, and would then eventually buy the Dock Service. Mr. Selby testified that $126,000 was not a fair price, but that there was a side deal whereby Mr. Selby would get all the proceeds from the sale of the duplexes as part of the overall sale price.

**Arizona Condominium**

In 1994, Ms. Selby bought a condominium in Arizona with money from the sale of her two homes. That money had been in a money market account that was in her name only. Ms. Selby testified that when she bought the first condominium she put it in both of the parties' names, even though she paid for it. She stated that Mr. Fay recommended that she switch it to just her name since it was going to her children. Then, when she sold that condominium and bought a second one with the proceeds, she put it in her name only. The condominium was in her trust. She testified that she also paid all of the maintenance fees and other costs that went into the condominium. Mr. Selby testified that

some of his money went into the condominium as well. But he agreed that the condominium should go to her in the property division.

**446–Acre Farm and Farmhouse**

The 446–acre farm that is the main issue in this case comes primarily from Mr. Selby's family or from the partnership. Ms. Selby testified that Mr. Selby had 111 acres before the marriage. She also testified that she is willing to relinquish any claim to about 46 acres that he had before the marriage. She claims that the other 288 acres were acquired during the marriage and that she is entitled to an interest in half.

Mr. Selby bought farmland during the marriage. He testified that most of the land was bought on behalf of the partnership and that it was not in his name. He also testified that he purchased 102 acres with Ms. Selby. Some money was borrowed to make these various purchases, but it is not clear from the transcript whether money was borrowed for the partnership property or whether money was borrowed for the 102 acres that they bought together or for both. Mr. Stephen Smith, Ms. Selby's expert witness, also said that 102 acres were acquired after the marriage. All of the farm property was placed into Mr. Selby's trust. Ms. Selby testified that she transferred and surrendered her interest in the land so that it could go into the trust on the advice of Mr. Fay. She stated that she did not surrender her marital interest in the land and was not aware that she had done so.

Ms. Selby also testified that there was a debt on the properties that Mr. Selby owned and that she assisted in paying on the debt during the marriage. She testified that they paid the taxes on the total 446 acres. There is a lease on the farm and Mr. Selby testified that the lease paid for the debt on the farm. Ms. Selby testi-

fied that she had not paid anything on the farm debt in years because the lease pays the debt, but claimed that some of the debt had earlier been paid down by money from a joint account for the Dock Service. Mr. Selby testified that he paid all of the taxes and insurance on the property.

In 1998 the partnership dissolved. As part of the dissolution of the partnership, all of the property that was owned by the partnership and the siblings was redistributed between the four of them, through a Farm Exchange Agreement. Ms. Selby was involved in helping Mr. Fay with the dissolution and the agreement although the extent of her involvement was disputed at trial. Mr. Fay testified that under Missouri law, when property is taken out of a partnership, the spouses of the partners must sign a document stating that they are releasing their marital rights. He testified that Ms. Selby signed the agreement to consent to her marital interests being transferred in the exchange agreement. Ms. Selby testified that she did not understand this to mean that she had no marital interest in property that Mr. Selby acquired during marriage if their marriage was to terminate. She also testified that she signed the agreement because she felt that she was half owner of the land and that she was agreeing to an exchange of the farmland. Mr. Fay was not able to remember whether he explained to Ms. Selby that by signing the various agreements she was giving up her right to any marital interest in the property if the parties were to divorce.

As a result of this agreement, property owned by all the siblings and by the partnership was transferred among the siblings. The 102 acres that Mr. and Ms. Selby purchased together was traded through the agreement, so it is not actually a part of the current 446 acres. After all the property was traded, the 446 acres was placed into Mr. Selby's trust.

As a part of the agreement, Mr. Selby got a piece of land that required him to take over a loan from a bank. The bank would not loan money on land in a trust; it had to be in the name of individuals. So on November 18, 1998, Mr. Selby took all 446 acres out of the trust and placed the land in the parties' joint names. They received the loan from the bank. The 446 acres was transferred back into Mr. Selby's trust on December 21, 2000, once the loan was paid off. Ms. Selby testified that the land was to remain half hers, but she did not produce any document that showed her interest in the land. Mr. Fay testified that he did not know of any document that gave Ms. Selby any interest in the farm. But he also did not recall any conversation about the Selbys' intentions with regard to the property. Mr. Selby testified that there was never any question that he owned the property.

The farmhouse was built on a portion of the 446 acres about three years before the parties divorced. The $126,000 that Mr. Selby received from the sale of Selby Dock Service was used to pay for the farmhouse, and he testified that the parties planned to live there for the rest of their lives. Ms. Selby testified that she thought that they had a construction loan on the house, but she was not certain. She also testified that the contract cost of the house was $127,000, but that price did not include a number of extras that they jointly purchased. She traded a boat to the contractor, which covered part of the price. But Ms. Selby admitted that Mr. Selby repaid her for the cost of the boat. Mr. Selby also presented a letter from Ms. Selby to her attorney in which she said that Mr. Selby reimbursed her for all the money she invested in the house. Ms. Selby said that he did not repay her for everything.

Finally, Mr. Selby testified that Ms. Selby did not financially contribute to the house at all.

## Additional Evidence Adduced at Trial

Two different appraisals of the farm property were admitted at trial. The appraisal of the farm and farmhouse presented by Ms. Selby was $900,000. Mr. Selby's appraisal was $796,000.

Ms. Selby also had Mr. Stephen Smith, a CPA, testify as an expert about the proper property division. Ms. Selby hired him to prepare a schedule of allocation of the property based on a myriad of documents that she produced about all the assets that both parties had both before and during the marriage. Mr. Smith created a spreadsheet that listed values for all the property and allocated it as separate or marital and assigned it accordingly. Mr. Selby objected multiple times to the admission of the spreadsheet because he did not agree with the values placed on the spreadsheet and because Mr. Smith was not an expert appraiser. The trial court chose to accept Mr. Smith's testimony for how the property should be divided, "not necessarily taking into consideration the values that are not supported by evidence otherwise presented."

Mr. Smith testified that he made his calculations in an attempt to reach the most equitable result for everyone and followed the law as far as how to calculate the value of a marital interest in and contribution to property that is in only one party's name. He asserted that the fact that the deeds for the duplexes and the farm are only in Mr. Selby's name did not alter the fact that Ms. Selby had an interest in those properties through her marital contributions. He also asserted that the farm was transmuted into marital property when it went into the parties' joint names.

The trial court accepted Mr. Smith's spreadsheet as Ms. Selby's proposed property distribution with the understanding that Mr. Smith was not an expert on values and that there was no foundation for the values listed.

## Divorce Decree

The trial court entered a judgment dissolving the marriage on June 1, 2003. The decree stated that the parties have certain marital property that must be divided fairly and equitably between them and that they each have separate non-marital property that should be set-aside to each of them. The trial court then set out what each party was awarded as his or her sole and separate property, which included property specifically identified as separate, non-marital property, and what debts each party was to assume. The trial court accepted the stipulated personal property division, as well as all the other property divisions over which there was no dispute. The trial court awarded half of the proceeds from the sale of the duplexes to each of the parties. Mr. Selby received all proceeds from any farmland leases and the 446–acre farm.

After the trial court issued its judgment, Mr. Selby went to the bank and, without authorization, withdrew all of the proceeds that were in escrow. He did have two separate cashier's checks issued, one to himself and one to Ms. Selby, but he then took both checks with him. He had all the interest that had accumulated on the proceeds included on his check only. Ms. Selby found out that Mr. Selby had taken both checks when he wrote her a letter on July 29, 2003, telling her to get her personal property out of the house by August 15. In that letter he told her that he had her money and would give it to her when everything was completed. On two occasions in August 2003, Ms. Selby went to the family home and took all of the property in the home that was awarded to her in

the decree. She also informed the escrow company that Mr. Selby had wrongfully withdrawn the money and the escrow company put a stop payment on the check issued in her name. It then issued her a new cashier's check on August 13, 2003, including her half of the interest, which she took possession of and deposited into her account.

Ms. Selby appeals the trial court's division of marital property. She brings two points on appeal. She first contends that the trial court erred in its characterization of the farm, the farmhouse, and the improvements on the land as Mr. Selby's non-marital property. She asserts that this decision is not supported by substantial evidence and is against the weight of the evidence because the trial court did not properly apply the source of funds rule. She claims that the trial court was required to determine what portion of the value of that property comes from Ms. Selby's contributions to the purchase and financing of the property and house. She next contends that the trial court erred in its characterization of the farm property because it did not properly apply the transmutation rule. She asserts that since the evidence shows that the farm was deeded from Mr. Selby's trust to their joint names to facilitate a loan on part of the property, Mr. Selby failed to rebut the presumption of marital property even though the property was later transferred back into his trust. Mr. Selby moved to dismiss Ms. Selby's appeal because she has accepted the benefits of the judgment. We took the motion to dismiss with the case.

## II. Motion to Dismiss

Mr. Selby asks this court to dismiss Ms. Selby's appeal. Mr. Selby relies on the general rule that a party who voluntarily accepts the benefits of a judgment may not then prosecute an appeal to reverse it. *McIntosh v. McIntosh*, 41 S.W.3d 60, 65 (Mo.App. W.D.2001). A party does not have the right to " 'enjoy the fruits of a judgment' " and to attack it on appeal. *Id.* (quoting *In re Marriage of Vinson*, 839 S.W.2d 38, 40 (Mo.App. S.D. 1992)). Mr. Selby asserts that the general rule applies here because Ms. Selby has taken possession of several items awarded to her in the divorce decree and converted them to her own use, and, therefore, has waived her right to appeal the property division.

Both parties came into the marriage with extensive property. The trial court set aside their respective separate, nonmarital property and divided the marital property. The 446–acre farm was awarded to Mr. Selby as his separate property in the decree. Ms. Selby is appealing only that particular property allocation, claiming that she had a marital interest in a portion of that farm and that the trial court erred in its characterization of this property. The trial court awarded Ms. Selby, among other things, all of the household goods, furnishings, and personal property listed on an exhibit attached to the order, which was the bulk of the personal property in the marital home. It is these items that Ms. Selby has taken from the marital home and that form part of the basis for Mr. Selby's claim that she has waived her right to appeal. The trial court also divided the proceeds from the sale of the duplexes. Ms. Selby's acceptance and cashing of her half of the proceeds forms the other basis for Mr. Selby's claim that she has waived her right of appeal.

Ms. Selby argues that the general rule by asserting that the trial court mischaracterized the farm because she obtained no benefit from the judgment, in that she did not receive a portion of the farm asset.

This argument is without merit. The only thing the trial court had to do was to divide the property between the parties. Included in this division was deciding who was entitled to what portion of the farm. Each allocation of property was not a separate part of the judgment. *Cf. Vinson*, 839 S.W.2d at 41–42 (wife appealed the marital ·property division as well as the maintenance and attorney's fees decisions; although she was foreclosed from appealing the marital property division because she had accepted the benefit of that judgment, she was not barred from bringing her other two complaints because they were unrelated). The judgment was only about the division of property and Ms. Selby did benefit from that judgment because she received other pieces of property.

■ Ms. Selby then argues that even if the general rule applies, Mr. Selby's motion should be denied because this situation falls within one of the exceptions to the general rule. There are several factors considered in deciding whether acceptance of the benefit of the judgment fits within an exception: "(1) the amount received was a small portion of the total judgment; (2) the amount accepted has effectively been conceded to be due by a husband who did not appeal; (3) the acceptance of the benefits was due to financial distress; (4) the absence of prejudice to the judgment debtor husband; and (5) where the only issue on appeal is whether an award will be increased." *McIntosh*, 41 S.W.3d at 66 (internal quotation marks and citations omitted). Several cases have also suggested that whether acceptance of partial payment of a judgment allows for an exception to the general rule is decided case-by-case, considering all of the relevant circumstances. *E.g., George v. George*, 991 S.W.2d 679, 681 (Mo.App. S.D. 1999).

Ms. Selby fits within several of the exceptions. With regard to the personal property that she has taken from the marital home, because Mr. Selby stipulated to her receiving that property, he has effectively conceded to that being due to her. Further, he sent her a letter telling her to get her things out of the house. So taking the personal property does not foreclose her bringing this appeal. With regard to the proceeds from the duplexes, although Mr. Selby contested her entitlement to the proceeds during the trial, he has not appealed the trial court's award of half of those proceeds to her. So he has again effectively conceded that award.

Mr. Selby's actions after the final judgment present an even better reason not to foreclose her appeal since she accepted the proceeds from the sale of the duplexes. As discussed in the factual background section, she did not seek to get this money. It may be inferred that she only took possession of this money because Mr. Selby wrongfully procured it from the escrow company and the company then issued her a check for her half of the money. Further, she stated that she still has the proceeds and will deposit them in the court registry if necessary until this case is resolved.

Ms. Selby seems to suggest that this puts her within the exception of accepting the benefits due to financial duress. But because she did not appear to be in any sort of financial straits, she is not within that exception. *Cf. McKee v. McKee*, 940 S.W.2d 946, 948 (Mo.App. S.D.1997) (Husband was in financial distress due to being unemployed, having very large monthly obligations, and Wife's collection efforts; selling the marital home awarded to him in the divorce decree was within an exception and did not preclude his appeal over the division of the marital property). But in looking at the total circumstances here,

she clearly only took the benefit from the judgment because Mr. Selby took the money from escrow, without authorization; she was simply attempting to protect the interest given to her by the trial court. In these particular circumstances, and considering the equities involved, her receipt of half of the proceeds is not a voluntary acceptance of the benefits of the judgment and should not be a factor in deciding to dismiss her appeal. *See id.* (after consideration of the factors for finding an exception to the general rule, the court found that Husband's sale of the marital house was not a voluntary acceptance of the benefits of the judgment and under "the peculiar situations of the parties in this case and given the equitable considerations involved, we are not persuaded that Husband's appeal should be dismissed.").

Finally, Ms. Selby is not asking for a redistribution of any other assets, she is only asking to receive a greater award because she believes that she is due something from her portion of the marital interest in the farm, another exception to the general rule. Her acceptance of her personal property and half of the proceeds from the sale of the duplexes is not inconsistent with her request for more marital assets. *Jezewak v. Jezewak,* 3 S.W.3d 860, 863–64 (Mo.App. E.D.1999). For all of these reasons, her appeal should not be dismissed and we deny Mr. Selby's motion.

### III. STANDARD OF REVIEW

■ We review the trial court's decision in a dissolution of marriage action under the *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976), standard and we will affirm that decision unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Farnsworth v. Farnsworth,* 108 S.W.3d 834, 837 (Mo.App. W.D.2003). We view the evidence and reasonable inferences therefrom in the light most favorable to the decree and disregard all evidence to the contrary. *Id.* The appellant has the burden of demonstrating error. *Beckham v. Beckham,* 41 S.W.3d 908, 911 (Mo.App. W.D.2001).

■ The trial court has broad discretion in identifying property as marital or separate. *Id.* When the characterization of property depends on an assessment of witness credibility, we will defer to the trial court's credibility determinations. *Id.* at 911–12. The trial court has equally substantial discretion in dividing the marital property. *Foraker v. Foraker,* 133 S.W.3d 84, 100 (Mo.App. W.D.2004). This discretion is abused only if the ruling is clearly against the logic of the circumstances and so arbitrary and unreasonable that it shocks the sense of justice and indicates a lack of careful consideration. *Id.* We will affirm the division of property unless it is unduly weighted in favor of one party. *Beckham,* 41 S.W.3d at 914.

### IV. LEGAL ANALYSIS

Both of Ms. Selby's points on appeal deal with the characterization of the 446–acre farm and all of the improvements on it as Mr. Selby's separate, non-marital property. She complains that the trial court erred in finding that all of that property belonged solely to Mr. Selby because under either the source of funds rule or transmutation rule she gained an interest in some or all of that property.[2]

■ In a dissolution proceeding, the trial court follows a two-step procedure in

---

2. Because neither party appealed any other portions of the trial court's judgment, this discussion will focus solely on the 446–acre farm even though some other property was disputed during trial and some of this discussion could apply to that property as well.

dividing the parties' property. *McKown v. McKown*, 108 S.W.3d 180, 183 (Mo.App. W.D.2003). The court first sets apart to each spouse such spouses' non-marital property and second divides the marital property and debts "in such proportions as the court deems just" after considering the relevant factors. *Id.*; § 452.330.1.[3] Marital property is all property acquired by either spouse after the marriage except:

(1) Property acquired by gift, bequest, devise, or descent;

(2) Property acquired in exchange for property acquired prior to the marriage or in exchange for property acquired by gift, bequest, devise, or descent;

(3) Property acquired by a spouse after a decree of legal separation;

(4) Property excluded by valid written agreement of the parties; and

(5) The increase in value of property acquired prior to the marriage or pursuant to subdivisions (1) to (4) of this subsection, unless marital assets including labor, have contributed to such increases and then only to the extent of such contributions.

§ 452.330.2.

Further, all property acquired by either spouse during the marriage is presumed to be marital property regardless of whether both spouses' names are on the title.

§ 452.330.3. This presumption may be overcome by showing that the property was acquired by one of the ways listed in section 452.330.2. *Id.*

The trial court erred in finding that the entire farm was Mr. Selby's separate property. There clearly was a marital interest in some portion of the farm and we reverse and remand for the trial court to determine exactly how great that interest is and then to make a new division of marital property with that interest included. Due to the complexity of the facts in this case, we choose to provide the trial court with some instruction as to what should be considered on remand in determining how much of an interest the marriage has in the farm.

## A. Two theories Concerning Marital Interest in the Farm

On remand, the trial court must determine how much of the 446–acre farm is marital property. Based on the evidence already in the record, the marital interest could range from only a portion of the farm to the entire farm. The trial court may decide to accept more evidence on remand.

The source-of-funds rule applies if only a portion of the farm is marital.[4] To determine what portion of the farm is marital

---

**3.** Unless otherwise indicated, all statutory references are to RSMo. (2000).

**4.** Mr. Selby's attorney asserted that the trial court could not "carve out a legal description" that would correspond to any portion of the property in which the marriage has an interest. The rule allows the trial court to determine the most equitable result for everyone by finding how much of the value of a piece of property is marital. The fact that the property cannot be physically split between the parties does not mean that a portion of it cannot be designated as marital property. There are many cases where property is designated marital property, but the property itself is not split in half; it is awarded to one spouse and the fact that it is marital property is considered in the overall division. *See e.g., In re Marriage of Below*, 8 S.W.3d 233, 236 (Mo.App. E.D.1999) (holding that after the trial court properly determines the character of a farm, if it finds that a portion of that farm was marital property that part of the farm could be set off to the husband; but it must be awarded as his share of marital property, not his separate property); *Moritz v. Moritz*, 844 S.W.2d 109, 114 (Mo.App. W.D.1992) (holding that a portion of the house was marital property and that value must be divided between the parties as the court deems just after consideration of all the relevant factors).

property, the *Hill* calculation must be used. *Hill v. Hill*, 747 S.W.2d 718 (Mo. App. W.D.1988). *Hill* sets out what values must be known and the formula to be used to determine the marital interest. *Id.* at 719–20. We must know: (a) the value of the property at the time of marriage; (b) the indebtedness on the property at the time of marriage; (c) how much the indebtedness has been reduced due to marital funds (this is the marital contribution (MC)); (d) the value of the property at the time of dissolution; and (e) the indebtedness at the time of dissolution. *Id.* at 719. The non-marital contribution (NMC) is (a) minus (b) and the equity (E) is (d) minus (e). *Id.* Total contribution (TC) is the sum of the MC and NMC. *Id.* at 720. Non-marital property = (NMC/TC)E. *Id.* Marital property = (MC/TC)E. *Id.* If the property is debt-free, the court substitutes the value of the property (V) for the equity. *Alexander v. Alexander*, 956 S.W.2d 957, 961 & n. 2 (Mo.App. W.D.1997).

Under the source of funds rule, property is acquired as it is paid for. *McKown*, 108 S.W.3d at 184. Any increase in the value of separate property is marital property if marital assets or marital labor contributed to acquiring that increase. *Alexander*, 956 S.W.2d at 960. If the increase in the value of the property is due in part to marital contributions and in part to non-marital contributions, the spouse contributing the non-marital funds and the marital unit contributing the marital funds each receive a proportionate and fair return on their investment. *In re Marriage of Medlock*, 990 S.W.2d 186, 188 (Mo.App. S.D.1999). When the deed does not have both spouses' names on it, the spouse who is not named may still be awarded an increase in the value of the property since the marriage. *McKown*, 108 S.W.3d at 185.

It is equally possible that under the theory of transmutation the entire farm has become marital property. Under the theory of transmutation, separate property may be transmuted into marital property by express or implied agreement or by gift. *Jinks v. Jinks*, 120 S.W.3d 301, 305 (Mo.App. W.D.2003). When a spouse places his or her separate property into the names of both spouses, a rebuttable presumption arises that the property has been transmuted into marital property. *Id.* This presumption can only be rebutted with clear and convincing evidence that the owner spouse did not intend to convert the property to marital property. *Id.* "Clear and convincing evidence is evidence that 'instantly tilts the scales in the affirmative when weighed against the evidence in opposition, and the fact finder's mind is left with an abiding conviction that the evidence is true.'" *Id.* (quoting *Montgomery v. Montgomery*, 18 S.W.3d 121, 124 (Mo. App. S.D.2000)).

## B. The Marital Interest in the Property

### 1. The Farmland

Mr. Selby owned some farm property when the parties married. After the marriage, he purchased more farmland. Some of that property was bought for and through the partnership that Mr. Selby had with his siblings, but Mr. and Ms. Selby purchased at least 102 acres together. Ms. Selby testified that they purchased 288 acres together and Mr. Selby testified that they purchased 102 acres together. Because they are in agreement that they bought 102 acres together during the marriage, at least 102 acres of the farm is marital property. § 452.330.2. Ms. Selby is entitled to a marital interest in the farm property proportionate to the increase in the value of the property as it was acquired through the use of marital

funds, *Medlock,* 990 S.W.2d at 188, i.e. the additional 102 acres. The trial court misapplied the law in finding otherwise.

■■■ Ms. Selby, however, also claims a marital interest in another 186 acres. If marital funds were used to purchase this land, Ms. Selby has an interest in these acres, even if they were bought by the partnership. And the record is not clear how this property was purchased. Under Missouri's Uniform Partnership Act, a partnership is not a legal entity separate from the individual partners. *Coleberd v. Coleberd,* 933 S.W.2d 863, 869 (Mo.App. S.D.1996). Any assets accumulated in the partnership after operating expenses are paid are undistributed income and profits. *Id.* A partner's share of the profits and surplus is that partner's personal property. *Id.;* § 358.260. So any property bought with partnership profits after the marriage is marital property to the extent of Mr. Selby's interest in the partnership. *See Engeman v. Engeman,* 123 S.W.3d 227, 233, 235–36 (Mo.App. W.D.2003) (affirming trial court's finding that husband's 50% ownership interest in the partnership and its assets was marital property and finding that real property titled in husband and his father's name was 50% marital because it was purchased with partnership funds); *Coleberd,* 933 S.W.2d at 869 (corporation was marital property to the extent that earnings from the partnership, which was husband's separate property, were used to finance the formation of the corporation because such earnings were marital property).

The record is also not entirely clear as to whose name is on the title to the property that was purchased. If the property was bought in the partnership's name, then, as discussed, there is a marital interest to the extent of Mr. Selby's interest in the partnership. If the property was titled in individual names, however, that property belongs to the individual and not the partnership and the marriage has an interest in it to the extent of Mr. Selby's ownership. *See In re Marriage of Rickard,* 818 S.W.2d 711, 720 (Mo.App. S.D. 1991) (property purchased by husband after the marriage that was titled in his individual name and paid for with funds from his partnership is marital property; funds used were income from the partnership and, therefore, marital property). And if loans were taken out to purchase the land and partnership profits or the land itself paid for the loans, the marriage again has an interest in that property to the extent of Mr. Selby's interest, regardless of whose name is on the title. *See id.* (company bought with a loan by husband and his partner that was a separate entity from the partnership and that generated enough profits to pay off the debt was marital property). On remand, the trial court should accept additional evidence to determine what funds were used to purchase this additional 186 acres and whose name was originally on the title.

■■■ Mr. Selby also testified that there is a debt on the farm that is being paid by a lease on the farm. Income earned during the marriage from separate property is marital property, including rental income. *Kauffman v. Kauffman,* 101 S.W.3d 35, 45 (Mo.App. W.D.2003). So even if the farm was separate property, the rent from the lease is marital property. *In re Marriage of Box,* 968 S.W.2d 161, 164–65 (Mo.App. S.D.1998). The marriage, therefore, also has an interest in the farm in the proportion that the lease has lessened the debt because that has increased the value of the farm. "If property acquired before marriage is subject to a loan, the property becomes marital property to the extent marital funds are used to pay off the loan." *Rhodus v. McKinley,* 16 S.W.3d 615, 618 (Mo.App. W.D.

2000) (internal quotation marks and citation omitted). Erasing a debt increases the value of the property. *Id.* at 618–19. Mr. Selby also asserts that some of the debt on the farm was paid by the Dock Service business account. Again, while the Dock Service was Mr. Selby's separate property, any income he earned from the Dock Service after the marriage was marital property. *Moore v. Moore,* 111 S.W.3d 530, 535 (Mo.App. S.D.2003) ("Income received from non-marital property subsequent to marriage is marital property in Missouri."). And while there was some dispute as to whether Ms. Selby's contributions to the Dock Service gave her a marital interest in the company, the income is marital property regardless of whether Ms. Selby contributed to that income. *See Stidham v. Stidham,* 136 S.W.3d 74, 80 (Mo.App. W.D.2004) (although wife may not have contributed a lot toward the raising or selling of the crops, that is irrelevant in determining whether those crops are marital property). So there is also a marital interest in the farm to the extent any debts were paid down during the marriage and the trial court misapplied the law when it did not consider this.

During the trial, Mr. Selby made much of the fact that Ms. Selby's name does not appear on any of the titles to the properties that make up the total farm. But all property acquired after the marriage and before dissolution is presumed to be marital property regardless of in whose name the property is titled.[5] § 452.330.3. There are many cases where only one spouse's name appears on the title but the other spouse has an interest. *See e.g., Medlock,*

990 S.W.2d at 188 (home that husband owned before marriage became marital property when the entire loan on it was paid off during the marriage); *Moritz,* 844 S.W.2d at 112–13 (house was titled in wife's name only, but a portion of the house was marital property because marital funds were used to make some of the mortgage payments).

Mr. Selby is apparently thinking of the "inception of title" doctrine that Missouri used to use to classify property, under which property was classified as entirely separate or entirely marital at the moment title was taken. *Hill,* 747 S.W.2d at 719. But Missouri no longer uses that rule, instead applying the more equitable source-of-funds rule. *Id.*

In considering all these various ways in which there was a marital interest in some portion of the farm, it is clear that the trial court misapplied the law in declaring that the entire farm was Mr. Selby's separate property.

## 2. The Agreements

■ Even accepting that Mr. and Ms. Selby purchased 102 acres together, Mr. Selby maintains that Ms. Selby has no claim in any of the current 446–acre farm because of the Farm Exchange Agreement.[6] He claims that the original 102 acres is not a part of the current 446 acres and second that she relinquished any claim when she signed the Farm Exchange Agreement. The fact that the original 102 acres is not part of the current 446 acres is irrelevant. No one disputes that through the agreement all the siblings wound up

---

5. We are not certain how Mr. Selby can make this claim as Ms. Selby's name does appear on some of the deeds. But because a spouse may have an interest in property even if that spouse's name is not on the title, there is no need to resolve this question.

6. Because we are holding that Ms. Selby likely has an interest in more than just the 102 acres, this argument and our resolution of this argument also apply to that additional acreage.

with their fair share of all the property that the four of them owned before the dissolution of the partnership. Although Mr. Selby did not keep the specific 102 acres that he and Ms. Selby purchased, the value of that 102 acres is accounted for within the total 446 acres that he had after the dissolution. Therefore, Ms. Selby still has an interest in 102 acres of the farm because that 102 acres was marital property and its value still exists. Similarly, she still has an interest in any other property that she helped purchase that was exchanged under the agreement.

The effect of Ms. Selby's signature on the agreement is less clear. But in reading the agreement in its entirety, we do not think that she relinquished her marital interest by signing the agreement. The spouses of the Selby siblings "consent[ed] to their marital interests, if any, being transferred in the exchange agreement." Mr. Selby claims that this means that Ms. Selby relinquished her interest in any of the land being exchanged. But the agreement does not say that. "Transfer" and "relinquish" are not synonymous. Mr. Fay testified that these releases were required under Missouri law because property was being taken out of a partnership. No one has presented us with any law stating that by agreeing to property being transferred, the spouse has relinquished all claims to marital property to which the spouse would otherwise have a legitimate claim. Ms. Selby was simply agreeing to having her interest moved around in order to effect the dissolution of the partnership, resulting in each person taking the property finally received free and clear of any claims from the other siblings and their spouses. Her interest, like Mr. Selby's interest, simply transferred to the property that they ended up with after the exchange.

The way in which the parties to the agreement are referenced also supports finding that Ms. Selby did not relinquish any marital interest in the property. The first paragraph, which sets out the parties, states that each married couple will be referred to by the first name of the Selby sibling: "being JOHN SELBY and EDITH SELBY, his wife, hereinafter referred to as 'JOHN.'" Based on that statement, every time the agreement refers to "JOHN" we must read that as referring to both Mr. and Ms. Selby. The very next paragraph says that "JOHN" (which we read as Mr. and Ms. Selby) and his siblings are co-owners of various tracts of farmland, belying Mr. Selby's claims that Ms. Selby had no interest in the property. We acknowledge that the agreement then talks about the spouses of the siblings, seemingly ignoring the fact that the agreement has already established that each sibling's name referred to the marital unit as a whole. But that is merely poor drafting and is not sufficient to cause us to ignore the established designations. According to the agreement, each spouse was as interested in the transactions as the siblings. Also, all of the quit claim deeds include Ms. Selby's name, either as a grantor or a grantee, so she clearly had and has an interest in all the property as it was moved around. So the Farm Exchange Agreement did not result in Ms. Selby losing her interest in the farm.

 Mr. Selby also argues that Ms. Selby lost any interest in the farm because she agreed to place the whole farm into Mr. Selby's trust. He appears to be claiming that this trust triggers the section 452.330.2(4) exception to marital property: "[p]roperty excluded by valid written agreement of the parties." But nowhere in the trust documents is there any discussion of the status of the property placed in the trusts, let alone a clear intention to

exclude that property from being marital property. *Cf. King v. King,* 66 S.W.3d 28, 35 (Mo.App. W.D.2001) (antenuptial agreement specifically excluded certain property, so such property remained separate, but did not exclude income from that property, so the income was marital property); *McGilley v. McGilley,* 951 S.W.2d 632, 638 (Mo.App. W.D.1997) (antenuptial agreement specified what property was and would remain separate property).

Furthermore, these trusts were clearly set up only to deal with the parties' property after death, not divorce. Ms. Selby testified that the trusts were part of estate planning and that there was no contemplation of divorce when they were written. They both had children from prior marriages and were specifying how their property should be divided after their deaths. Mr. Fay also testified that he set up the trusts for estate planning purposes and that divorce was never discussed. In reading through the trusts, we find it clear that the parties intended to provide for one another, not take away interests.[7] We have already found that Ms. Selby had a marital interest in the farm; putting marital property into a trust in Mr. Selby's name does not mean that Ms. Selby no longer has any interest in the property.

Our appellate courts have found that property in a trust in one spouse's name can be marital property. *See e.g., In re Marriage of Maninger,* 106 S.W.3d 4, 8, 10 (Mo.App. E.D.2003) (husband created a trust in his name that, by the time of the divorce, had contained both separate and marital property; husband could not trace the funds in the trust back to his separate property so the trial court did not err in finding that the trust was marital property); *Klockow v. Klockow,* 979 S.W.2d 482, 486, 488–89 (Mo.App. W.D.1998) (affirming trial court's finding that a portion of the assets in a trust were marital property when husband set up the trust to keep his business property separate but commingled personal and business assets). We acknowledge that *Maninger* and *Klockow* are not exactly like this case because the wives in those cases were not involved in setting up the trusts and the husbands commingled funds. But these cases demonstrate that the name on the trust does not impact the classification of the property in the trust. And Mr. Selby's trust did have both marital and separate property in it, just like the trusts in the above two cases. Mr. Selby points to the *Moore* case to support his claim that property in his trust was separate property and remained that way. But *Moore* is centered on determining what portion of the trust property was marital because husband had the right to terminate the trust before the divorce and did not do so. 111 S.W.3d at 535. That case did not deal with testamentary trusts set up by a married couple, during the marriage, and we believe that it is inapplicable.

Finally, we believe that it would be against public policy to hold that when married couples place property into a trust in one name that property automatically becomes separate property and the other spouse loses the marital interest. Families, particularly in the case of second marriages, often use trusts as a part of estate planning. Testamentary trusts, such as these, are not created to change the character of the property or to prepare for divorce. We are not going to create a rule that complicates estate planning goals by suddenly declaring that such trusts destroy marital interests. And we have

---

**7.** We particularly note that under both trusts the surviving spouse is left with the full benefit and enjoyment of all the property mentioned in the trusts. This certainly does not suggest any intention to take away, or give up, a marital interest in the property.

found no law that directs us to do otherwise.

### 3. The Farmhouse

Interest in the farmhouse that was built on the 446–acre farm was also disputed. The trial court found that the farm and all improvements on it were Mr. Selby's separate property, which included the farmhouse. Ms. Selby claims that she has an interest in that farmhouse. Ms. Selby's interest could possibly arise based on how the house was paid for or the intentions of both parties when it was built.

It appears that mainly Mr. Selby's money went into the cost of building the house.[8] He used the money from selling the Dock Service to Ms. Selby's son to build the house. The Dock Service was Mr. Selby's separate, non-marital property. But Ms. Selby worked at the Dock Service for seven and one-half years after they were married. She suggested that the Dock Service became more valuable once she started working there, creating a marital interest in the company.

■■■■ To be entitled to a share of the increased value of a spouse's separate property due to marital labor, effort, or services, there must be comprehensive substantiation and proof of: (1) a contribution of substantial services; (2) a direct correlation between those services and the increase in value; (3) the amount of the increase in value; (4) performance of services during the marriage; and (5) the value of the services, the lack of compensation, or inadequate compensation. *Meservey v. Meservey*, 841 S.W.2d 240, 245–46 (Mo.App. W.D.1992). Performance of usu-

al spousal duties is not a substantial contribution such that an increase in the value of separate property becomes marital property. *In re Marriage of Patroske*, 888 S.W.2d 374, 379 (Mo.App. S.D.1994).

On remand the trial court should also consider whether Ms. Selby's efforts at the Dock Service gave her a marital interest in that company. The parties presented some evidence about this issue: Ms. Selby's work at the Dock Service allowed Mr. Selby to start his Boat Floater business; Mr. Selby denied that the business improved once Ms. Selby began working there; the parties lived on land that was paid for by the Dock Service; and Mr. Selby received an income from the Dock Service, which was marital property, *Moore*, 111 S.W.3d at 535. The trial court should consider this evidence, and any other evidence that the parties wish to offer on this issue, because if there was a marital interest in the Dock Service then some marital funds went into the cost of the farmhouse, making it at least partially marital property.

There is, however, another reason that we believe that the farmhouse is marital property. We have held that property bought in contemplation of marriage that is intended to be marital property is marital property. *See e.g., Stidham*, 136 S.W.3d at 78; *Beckham*, 41 S.W.3d at 912, 914. In *Stidham*, Mr. Stidham admitted that the house was built in contemplation of marriage and that he intended it to be marital property. 136 S.W.3d at 78. This court held that the house was clearly marital property. *Id.* It was irrelevant for purposes of classifying the property that

---

**8.** We acknowledge that Ms. Selby testified that she contributed to additions to the house that were not included in the original price. Mr. Selby, however, testified that she did not financially contribute at all. When characterization of property depends on a credibility decision, we defer to the trial court's determination of credibility. *Beckham*, 41 S.W.3d at 911–12. But if the trial court wishes to reconsider this question on remand, it is free to do so.

the house was built on land owned by Mr. Stidham's mother, that Mr. Stidham provided all the money to build the house, that his wife contributed little to the house, and that she paid none of the utility or insurance bills. *Id.* at 78–79.

In *Beckham*, Mr. Beckham made a down payment on land with his own money and titled the land in his own name. 41 S.W.3d at 910. He testified that this land was bought in anticipation of the marriage. *Id.* After the marriage both parties contributed to paying the mortgage. *Id.* at 911. This court held that the home was marital property either under the theory of transmutation or under the theory of property purchased in contemplation of marriage. *Id.* at 914.

Here, although the farmhouse was not built in contemplation of marriage because the parties were already married, *Stidham* and *Beckham* can still apply. Mr. Selby testified that he built the house with his money because he loved Ms. Selby. He also testified that the money from the sale of the Dock Service and the duplexes would be used to pay off the debt on the farm so that they could live there together for the rest of their lives off their income. So while the house was not built in contemplation of the marriage, it was built for the marriage and intended to be the marital home. And it was the marital home for three years before the parties separated. So the trial court should have concluded that the house was marital property. The fact that the house was paid for mainly, if not entirely, by Mr. Selby may be considered in apportioning the value of the house between the parties, but that does not change the fact that the house is marital property. *Stidham*, 136 S.W.3d at 78.

## 4. Applying the Source of Funds Formula

 The trial court is not required to assign values to marital property, but there must be evidence from which those values can be determined. *Waldon v. Waldon*, 114 S.W.3d 428, 431 (Mo.App. E.D.2003). Unfortunately, the trial court did not obtain evidence of the values necessary for the *Hill* calculation. The parties entered two different appraisals into the record: Ms. Selby's appraisal of $900,000, and Mr. Selby's appraisal of $796,000. The trial court did not state in its order which value was accepted. And there was no evidence of what the farm was worth at the beginning of the marriage. Any of the increase in value that is due to marital assets, which the trial court will determine based on the above discussion, is marital property. *Alexander*, 956 S.W.2d at 960. Mr. Smith attempted to introduce evidence of the values of all of the property that both parties owned, but his spreadsheets were not admitted for the values assigned to them. Mr. Selby even asserts that there was no substantial evidence to support the numbers that Mr. Smith used in his calculations. On remand the trial court must adduce evidence of these values, which will partially be based on its proper determination of the marital interest in the farm.

## 5. Transmutation

Ms. Selby also asserts that under the theory of transmutation the whole farm became marital property and that Mr. Selby did not rebut the presumption of marital property by clear and convincing evidence.

On November 18, 1998, Mr. Selby transferred the entire 446 acres out of his trust and into his and Ms. Selby's names. Mr. and Ms. Selby reconveyed the property back into Mr. Selby's trust on December 21, 2000. For approximately two years the property was in the parties' joint names. Under the theory of transmuta-

tion, even if the farm had been entirely Mr. Selby's separate property, it was presumably gifted to the marital unit and was no longer separate property. *Farnsworth,* 108 S.W.3d at 838–39 (when a spouse uses separate property to purchase property but has the property titled in both spouses' names, a gift to the other spouse is presumed and the property is transmuted into marital property).

On remand the trial parties' their names. *In re Marriage of Jennings,* 910 S.W.2d 760, 764 (Mo.App. S.D.1995). Mere self-serving testimony that it was not intended as a gift gets little weight. *Clark v. Clark,* 919 S.W.2d 253, 255 (Mo.App. S.D.1996). The parties may present more evidence either supporting or rebutting transmutation. The trial court can then decide whether Mr. Selby rebutted the presumption of transmutation by clear and convincing evidence.

## C. Effect of the Misclassification

 Mr. Selby argues that even if the trial court erred in classifying the farm as entirely separate property, this does not require reversal. Error in the classification of property is not necessarily prejudicial; the error must materially affect the merits of the action. *Farnsworth,* 108 S.W.3d at 839. If the decree is fair, we will not reverse because of an erroneous declaration of whether property is marital property. *Id.* Further, we are primarily concerned with the correctness of the result reached, not the route taken to reach it. *Foraker,* 133 S.W.3d at 101. We will affirm the trial court's judgment if it is cognizable under any theory. *Id.*

The trial court does not have to divide the marital property equally between the parties; the division must only be fair and equitable. *Id.* at 100. The trial court must consider all the relevant factors, which includes those factors listed in sec-

tion 452.330.1. *Id.* Here, the relevant factors in the statute are the economic circumstances of both parties at dissolution, the contribution of each spouse to the acquisition of marital property, and the value of the non-marital property set aside to each spouse. § 452.330.1.

Each party had substantial separate property. Ms. Selby's separate property includes her pension, her 401(k) plan, the Arizona condominium, and the timeshare. Although the trial court cannot allow consideration of the separate property that each party receives to have a substantial material impact on the overall division of marital property, the value of that separate property can be considered. *Foraker,* 133 S.W.3d at 103. Further, both parties were in good financial condition after the dissolution. And although a portion of the farm is marital property, the trial court may consider who contributed the most to the development of the farm in deciding how to apportion it. *Stidham,* 136 S.W.3d at 79–80.

But none of those factors is sufficient to allow us to affirm the division as it stands. Regardless of whose appraisal was accepted by the trial court, the farm is very valuable. Whatever interest Ms. Selby has in the farm is, therefore, going to be valuable. Without knowing what that interest is we cannot determine whether the division as it currently stands is fair. This misclassification does materially affect the merits of the action. So once the trial court determines how much of the farm is marital property, it should revisit the division of marital property and, with the inclusion of the marital interest in the farm, make certain that the division is equitable and fair. *See Foraker,* 133 S.W.3d at 100. Until that is done, we cannot decide whether the trial court acted within its discretion in dividing the marital property.

## V. Conclusion

The trial court misapplied the law and the evidence did not support its decision when it found that the entire 446–acre farm was Mr. Selby's separate property. We reverse and remand for the trial court to adduce additional evidence about how the farm was paid for and what actions the parties took with respect to the farm. After the trial court determines how much of the farm is marital property, the trial court should then divide the marital property, including the marital portion of the farm, in a just and equitable manner.

HAROLD L. LOWENSTEIN and RONALD R. HOLLIGER, JJ., concur.