**Samuel ROYALTY, Appellant,**

v.

**Opal Gwen ROYALTY, Respondent.**

**No. WD 68718.**

Missouri Court of Appeals,
Western District.

Sept. 30, 2008.

Jeffrey S. Royer, Blue Springs, MO, for appellant.

Diana L. Miller, Shawnee, KS, for respondent.

Before JAMES M. SMART, JR., P.J., LISA WHITE HARDWICK, and JAMES E. WELSH, JJ.

JAMES M. SMART, JR., Judge.

Samuel Royalty appeals the circuit court's judgment that calls for modification of the qualified domestic relations order (QDRO) which was entered as part of his 1998 dissolution of marriage from Opal Royalty. We affirm.

## Background

Samuel Royalty (Samuel) and Opal Royalty (Opal)[1] were married in January 1970. Their marriage was dissolved by decree dated June 16, 1998. As part of the dissolution, the parties entered into a "Marital Settlement Agreement," which was incorporated into the judgment.

The settlement agreement addressed the distribution of the couple's assets. One of those assets was Samuel's pension. At the time of the dissolution, Samuel had 25.5 years of service credit in his pension plan. He was eligible to retire at that time with a subsidized benefit. He also had the option of delaying his retirement and receiving a subsidized benefit after 30 years service (the "30–and–out" early retirement benefit). The relevant portion of the settlement agreement stated:

> ... at such time as Husband retires and becomes entitled to receive benefits under the pension and retirement plan, Wife shall receive the equivalent of 50% ... to that portion of the pension and retirement plan from the date of the marriage through the date of this Agreement.

The provision further provided that the division of those benefits would be made by a qualified domestic relations order (QDRO).

On April 6, 1999, the court entered a QDRO in connection with the dissolution decree. It stated, *inter alia*, that Opal had the right to select the date to begin receiving annuity payments ("shall begin to be payable on a date elected by the Alternate Payee, after Participant's earliest retirement age"). She elected to begin right away. Opal began receiving a benefit of $176.41 on August 1, 1999.

Samuel retired on April 30, 2003. He did not at that time have 30 years of pension credits to qualify for the 30–and–out benefits. To get the credits, he needed to contribute $2,550 to the pension fund. Samuel made the contribution. On May 1, 2003, he began receiving his portion of the benefit in the amount of $2,674.28. Opal's benefit was adjusted to $263.45 at that time. Opal's benefit did not include any portion of the 30–and–out benefit.

When Opal realized she was not being paid what she thought she was entitled to be paid under the settlement agreement, she brought a motion to enforce the settlement agreement. The motion stated that the QDRO, as it was drafted, did not effectuate the expressed intent of the parties' agreement regarding distribution of the

---

1. Hereinafter, we refer to Mr. and Mrs. Royalty by their first names for ease of reference.

pension plan, in that it was not being interpreted to include the subsidized pension benefits in Opal's portion.

Following a hearing, the court granted the motion. The court found that the QDRO, as adopted by the pension plan, did not reflect the parties' agreement at the time of the dissolution. In its amended judgment, dated August 6, 2007, the court found that it had jurisdiction under section 452.330.5[2] to amend the QDRO to effectuate the intent of the parties. The judgment ordered, adjudged, and decreed the following:

- the plain language of the Marital Settlement Agreement allows [Opal] to share in one-half of [Samuel's] 30–and–Out Pension Benefits that he accrued from the date of marriage through the date of the Marital Settlement Agreement.

- pursuant to section 452.330.5 RSMo, this Court has jurisdiction to amend the QDRO to effectuate the intent of the parties. The Court shall enter an amended domestic relations order specifying that [Opal] is to receive one-half of [Samuel's] 30–and–Out Pension Benefits that he accrued from the date of marriage through the date of the Marital Settlement Agreement.

- [Opal] has a judgment in the amount of $44,671.20 against [Samuel] for the arrearage that resulted from payments made to him by the ... Pension Fund since May 1, 2003 that should have been made to [Opal] based on the intent of the parties as set forth in the Marital Settlement Agreement.

Samuel appeals.

2. All statutory references are to the Revised Statutes of Missouri (RSMo) 2000, unless otherwise noted.

## Jurisdiction

On January 17, 2008, Opal filed a motion to dismiss, remand, or stay the appeal. She claims that the judgment is not final and appealable under section 512.020,[3] because it does not dispose of all the couple's property, in that no amended QDRO has been entered. Samuel responds that the judgment is final and appealable. The motion to dismiss was taken with the case. In light of *Brooks v. Brooks,* 98 S.W.3d 530, 531 (Mo. banc 2003), which states that the dissolution decree is the "final judgment" and the QDRO a "special order after final judgment," pursuant to section 512.020, we conclude that the judgment here is final and appealable, despite the lack of an amended QDRO. The motion to dismiss is denied.

## Standard of Review

As in any court-tried case, we will affirm the trial court's judgment unless it is not supported by substantial evidence, is against the weight of the evidence, or erroneously declares or applies the law. *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). Interpretation of the parties' settlement agreement and QDRO language is an issue of law, which we review *de novo. See Eveland v. Eveland,* 156 S.W.3d 366, 369 (Mo.App.2004); *Wood v. Wood,* 2 S.W.3d 134, 138 (Mo.App. 1999).

## Discussion

In Samuel's first point, he claims the trial court erred in ordering the QDRO to be amended to include his "30–and–out" retirement benefits. He contends that this is contrary to the terms of section 452.330.5. He also claims that the court's finding that the parties' intent was for

3. RSMo, cum. supp.2004.

Opal to receive 50% of the 30–and–out benefits (pro-rated to the length of the marriage) was against the weight of the evidence.

The court found that it had jurisdiction under section 452.330.5 to amend the QDRO. It then called for entry of an amended QDRO specifying that Opal is to receive one-half of Samuel's 30–and–out pension benefits to the extent that the benefits accrued from the date of marriage through the date of the settlement agreement.

■ Section 452.330.5 provides that a trial court's order as to distribution of marital property shall be final and not subject to modification, except that

> orders intended to be qualified domestic relations orders affecting pension, profit sharing and stock bonus plans … shall be modifiable only for the purpose of establishing or maintaining the order as a qualified domestic relations order or to revise or conform its terms so as to effectuate the expressed intent of the order.

The statute authorizes the circuit court to modify a QDRO for the stated purposes, and it places no time limits or restrictions as to when this can be done. *Wells v. Wells*, 998 S.W.2d 165, 168 (Mo.App.1999).

Samuel argues that there was no need to modify the QDRO here in order to establish it or maintain its status as qualified; thus, he says, the only way the circuit court could have had jurisdiction to modify was to "conform [the QDRO's] terms so as to effectuate the expressed intent of the order." *See* section 452.330.5; *Miles v. Miles*, 43 S.W.3d 876, 879 (Mo.App.2001). He contends that the original QDRO already expresses the intent of the order, and, therefore, the court lacked jurisdiction to modify it.

■ The gist of Samuel's argument is that the parties' intent at the time of the dissolution was for Opal to receive 50% of Samuel's accrued benefits calculated as of June 5, 1998, the date of the settlement agreement, and excluding the 30–and–out benefits. He devotes much of his argument to an examination of extrinsic evidence of the parties' expressions of their intent. He also discusses the parties' expressed understanding of the terms of the QDRO and what that reveals about their intent. The question, however, is what was the parties' intent *as expressed in the settlement agreement.* Examining the extrinsic evidence of the parties' intent, outside the four corners of the agreement, is not warranted unless the agreement's terms are ambiguous.

■ The normal rules of contract construction apply to settlement agreements. *Wood*, 2 S.W.3d at 138. The cardinal rule in the interpretation of a contract is to ascertain the intent of the parties and to give effect to that intent. *Eveland*, 156 S.W.3d at 368. We do this by giving the words used their plain and ordinary meaning as understood by a reasonable, average person. *Wood*, 2 S.W.3d at 138. Whether a contract is ambiguous is a question of law that we determine without deference to the trial court. *Eveland*, 156 S.W.3d at 369. In determining whether a decree is ambiguous, we consider the whole instrument. *Ward v. Ward*, 34 S.W.3d 288, 291 (Mo. App.2000). "A contract is not ambiguous merely because [the] parties disagree over its meaning." *Wood*, 2 S.W.3d at 138. An ambiguity arises when it appears from the four corners of the contract that "the terms are susceptible of more than one meaning so that reasonable persons may fairly and honestly differ in their construction of the terms." *Eveland*, 156 S.W.3d at 369. If an ambiguity exists, the parties' intent is a question of fact for the trial court to resolve by reference to extrinsic evidence. *Id.*

However, where the parties have expressed their final, complete agreement in writing and it contains no ambiguity, the intent of the parties must be determined solely from the four corners of the contract itself. *Id.* at 368.

The trial court found, in this case, that the marital settlement agreement, which was incorporated into the judgment, is not ambiguous. We agree. The relevant portion of the agreement stated:

> The parties have agreed that *at such time as Husband retires and becomes entitled to receive benefits under the pension and retirement plan,* Wife shall receive the equivalent of 50% as her separate property, and as actuarially adjusted, to that portion of the pension and retirement plan from the date of the marriage through the date of this Agreement. Said division of retirement and pension benefits will be made by qualified domestic relations [order]. (Emphasis added.)

This provision states that "at such time as Husband retires and becomes entitled to receive benefits," Opal is to receive 50% of the marital portion of Samuel's pension benefits (to "that portion ... from the date of the marriage through the date of this Agreement"). The marital portion of Samuel's benefits is calculated as 25.5/30, since the parties were married for 25.5 of the 30 years on which the benefits are based.

■ The parties intended for Opal to receive 50% of the marital portion "when [he] retires or becomes entitled to receive benefits." Pursuant to this language, if the benefit became subsidized due to the "30–and–out" provision, then Opal would receive 50% of 25.5/30 of the subsidized amount. It is true that Opal's decision to begin her benefit early tended to complicate the calculations. But that does not change the parties' intent as clearly stated in the settlement agreement.[4] Because the contract is not ambiguous, we need not examine the extrinsic evidence cited by Samuel in order to determine the parties' intent. "When the language of a [contract] provision is in dispute, the court must determine the parties' intent as manifested in the document itself and not by what the parties say they intended." *Wood,* 2 S.W.3d at 138.

In other cases with similar settlement agreement language, we affirmed the trial court's determination that the parties intended for the wife to share in the value of the husband's retirement pension as of the date of his retirement, not the date of dissolution. *See Miles,* 43 S.W.3d at 877 [5]

---

4. There seems to be no dispute that if this is the intent of the settlement agreement, then amendment of the QDRO would be necessary to effectuate that intent. The relevant provisions of the original QDRO state:

> 5. The Alternate Payee shall be entitled to 50% of Participant's estimated accrued benefit in the Plan as of June 5, 1998, the date of the parties' Marital Settlement Agreement, to be converted to a single life annuity for the life of the Alternate Payee. Such annuity shall begin to be payable on a date elected by the Alternate Payee, after Participant's earliest retirement age.
> 
> ....
> 
> 8. If the Participant shall retire on a date before normal retirement age with a subsidized early retirement benefit, an actuarial adjustment to recognize said early retire-

ment subsidy to the benefit payable to the Alternate Payee shall be made. The actuarial adjustment shall be based on the percentage of that benefit earned during the marriage as if the Participant left the Teamster industry on June 5, 1998. When Participant retires, Alternate Payee shall receive 50% of the subsidy that would have been applicable to the benefit that would have been paid had the Participant left Covered Employment on June 5, 1998.

5. The facts in that case are strikingly similar. The husband in *Miles,* who was not retired at the time of dissolution, had the option of retiring early with a supplemental benefit. 43 S.W.3d at 877. When he did so, the plan administrator interpreted the QDRO *not* to include the supplement in wife's 50% portion

(agreement provided for wife to receive "One-half (1/2) of HUSBAND'S General Motors pension plan as of the date HUSBAND actually retires or ceases to accrue benefits"); and *Ward*, 34 S.W.3d at 292–93 (agreement stated that wife "is entitled to receive ... 50% of the value in monthly payments of the [pension] plan on [the date of dissolution], to be paid over to her as a portion of [the husband's] monthly pension benefits"). The court in *Ward* observed that an interpretation that values a spouse's marital portion of the pension based on the "whole benefit" at the participant's retirement date is the "now almost standard" approach to division of pension benefits in Missouri. *Id.* at 292.

These cases are consistent with the trial court's judgment in this case. The unambiguous language of the settlement agreement allows Opal to share in one-half of Samuel's final benefits, in the proportion of the length of the marriage to the length of Samuel's service. The trial court did not err in concluding that it has jurisdiction to amend the QDRO in order to effectuate that intent.

■■ Samuel also asserts that the court ruling was erroneous because it allows Opal to receive the benefit of Samuel's post-dissolution self-contribution of $2,550. Samuel claims this is improper.

In *Ward*, the husband made a similar argument when he claimed that equitable principles required modification to preclude the wife from receiving the benefit of his post-dissolution employment "for the rest of his working life." 34 S.W.3d at 291. In rejecting this claim, the court explained

that "higher retirement benefits that may be realized by the pension plan participant through continued employment after the dissolution are made possible, in part, by [the] years of employment during the marriage." *Id.* "To preclude the spouse from an opportunity to share in these increased benefits would be unjust and inequitable," the court added. *Id.* Quoting *Lynch v. Lynch*, 665 S.W.2d 20, 24 (Mo.App.1983), the court discussed the need to divide pension benefits in a way that recognizes the full value of the marriage years:

> The award to the wife of a portion of the whole benefit[ ] is, at this point, an award of rights, the value of which cannot be fixed with precision until they mature. A present division of those rights which allows the wife her share of their value, when and if they mature, does not award her after-acquired separate property of her former spouse. Rather, such a division on those conditions merely assures that the parties' qualitative parity of interest will be maintained and that their respective interests in the rights that the court divided will remain of equal shares.

*Ward*, 34 S.W.3d at 291. That rationale is applicable to this case also.

Samuel attempts to distinguish *Ward* and *Lynch* on the basis that they did not involve post-dissolution *contributions* by the participant but, instead, focused on post-dissolution *earnings*. Samuel says he did not accrue the 30–and–out benefit; rather, he "bought" it with post-dissolution funds. The 30–and–out benefit would not

and began paying benefits to the parties in wholly disproportionate amounts ($2,233.18 to husband and $196.77 to wife). *Id.* The wife *sought to modify* the QDRO to include the supplement in her portion on the basis that this was the express intent of the parties' agreement. *Id.* The trial court agreed and granted the motion. Husband appealed. *Id.*

at 878. This court affirmed. We found, based on the clear language of the dissolution decree, that husband's total vested interest in his pension plan included all of the employer-paid benefits, and, thus, the wife was entitled to receive one-half of the supplemental benefits. *Id.* at 880.

have existed had it not been for his self-contribution, he says.

We disagree. Although he "bought" his 30–and–out benefits, it is the same as if he had gained the same benefit by working longer and not retiring early. The parties contemplated Samuel working longer at the time of the dissolution, and the parties understood and agreed that Opal would participate in whatever Samuel qualified for. Twenty-five and one-half years of vesting occurred during the marriage. The payment of $2,550, which the evidence showed amounted to 75 days of employment, is accounted for in the 25.5/30 calculation, in that the situation is the same as if he had achieved the 30 years by working. He chose to take early retirement and purchase the extra credit instead of seeking further employment with another company participating in the fund. That does not change Opal's entitlement.

■ Samuel's other points are both based on equitable considerations. He says the trial court erred in rejecting his argument that Opal's claims are barred by the doctrine of laches, in that seven years elapsed before she sought to modify the QDRO. Also, he contests the trial court's rejection of his claim that Opal waived any right she had to arrearages by accepting all the payments in the lesser amount without objection. Both claims are without merit.

■ "Laches is the neglect for an unreasonable and unexplained length of time, under circumstances permitting diligence, to do what in law should have been done." *Ewing v. Ewing*, 901 S.W.2d 330, 333 (Mo.App.1995). Mere delay in asserting a right, in itself, does not constitute laches. *Id.* The delay must work to the disadvantage and prejudice of the opposing party. *Id.* In other words, "laches requires that a party with knowledge of the facts giving rise to his rights delays assertion of them for an excessive time

and the other party suffers legal detriment therefrom." *Id.* at 334.

Samuel complains that seven years elapsed after Opal became aware that she would not receive the 30–and–out benefits before she sought to assert her rights. Opal says she did not become of aware of the fact until after Samuel retired in May 2003 and that she immediately tried to contact her attorney at that time. The trial court found that Opal's delay was not unreasonable.

As explained in *Wells*, "section 452.330.5 authorizes the court to modify a QDRO and places no time limits or restrictions upon the court as to when this can be done." 998 S.W.2d at 168 (rejecting a claim that the judgment could not be reopened because more than 30 days had elapsed since its entry). To invoke laches in a case such as this would restrict the ability of the court to correct a QDRO that does not reflect the intent of the order and, thus, would negate the intent of the statute.

In any event, Samuel has not shown that this case meets the criteria for laches. Samuel has the burden of proving more than mere delay in Opal's assertion of her rights. He must show that the delay disadvantaged or prejudiced him. *Ewing*, 901 S.W.2d at 333. Samuel claims that he was prejudiced by Opal's delay. He says the judgment "will be a great injustice if allowed to stand," in that amendment of the QDRO will reduce his monthly income by over 38% (from $2,674 to $1,650) in addition to imposing an arrearage of over $44,000. Samuel laments that at age fifty-eight, he will have to re-enter the work force to replace the lost income. Had Opal taken action in 1999 when she first became aware of the problem, he says, it could have been resolved before he retired. He may have chosen to seek other employment rather than retire, or to adjust his

standard of living to reflect an uncertain or reduced income.

No doubt this development causes inconvenience to Samuel. While we recognize that, we cannot say that the judgment is "a great injustice." The trial court recognized that the injustice that Opal would incur if her claims were denied must be considered as well. The retirement plan constituted the only substantial asset of the couple's marital property. The couple had been married twenty-eight years, and Opal lacked substantial earning power. No maintenance obligation was imposed on Samuel. The parties had few other assets, so presumably the pension plan was an important part of the distribution matrix. Surely the pension distribution was an important aspect of reaching a settlement. Opal's original attorneys may have been less than attentive to the operation of the QDRO, but Opal herself was not shown to be derelict in the matter. Also, we cannot say that the trial court was unjust to finally impose on Samuel the terms of the settlement agreement that should have been in effect at the outset. The court did not err in rejecting Samuel's laches argument.

Samuel also contends that Opal has waived any right she had to arrearages by accepting all the payments in the lesser amount without objection. He bases this "on the general rule that a party who voluntarily accepts the benefits of a judgment may not then prosecute an appeal to reverse it." *Selby v. Selby*, 149 S.W.3d 472, 480 (Mo.App.2004). There are exceptions to the general rule. *Id.* at 481. Whether the general rule applies is decided on a case-by-case basis after considering all the relevant circumstances. *Id.* It has been said that the factors to be considered include: (1) whether the amount received was a small portion of the total judgment; (2) whether the party who seeks to invoke the doctrine has effectively conceded that the amount accepted was due and did not appeal; (3) whether the acceptance of benefits was due to financial distress; (4) whether there was prejudice to the party invoking the doctrine; and (5) whether the only issue on appeal is whether an award will be increased. *Id.*

Here, the most significant factor is that Opal took an early distribution under a complicated mathematical formula that included actuarial calculations. She cannot be charged with knowing acquiescence when she lacked the ability to determine for herself whether the fund's calculations were correct. The amount Opal received on a monthly basis, $176.41 (later increased to $263.45), was a small portion of the amount she would ultimately receive. And, significantly, no one knew what the final determination would be until Samuel retired.

The courts have not strictly applied this general rule of waiver in marital dissolution cases "because of the peculiar situations of the parties and the equitable considerations involved." *Reynolds v. Reynolds*, 861 S.W.2d 825, 828–29 (Mo. App.1993). We do not believe the facts and circumstances of this case warrant its application here. The trial court did not err in refusing to apply the doctrine of waiver. Point denied.

### Conclusion

For the foregoing reasons, the judgment is affirmed.

All concur.