**In re: The MARRIAGE OF Agnes J. MILLER and Jeffrey L. Miller**

**Agnes J. Miller, Petitioner–Respondent,**

**v.**

**Jeffrey L. Miller, Respondent– Appellant.**

**No. SD 30671.**

Missouri Court of Appeals, Southern District, Division One.

Aug. 16, 2011.

Bryan O. Wade, Springfield, MO, for Appellant.

C. Ronald Baird, Springfield, MO, for Respondent.

DON E. BURRELL, Judge.

Jeffrey L. Miller ("Husband") appeals the judgment that ended his marriage to Agnes J. Miller ("Wife").[1] In six points relied on, Husband contends the trial court erred by enforcing a purported marital settlement agreement ("the Marital Agreement"), ordering the parties to enter into a lease ("the Lease") with one another for an office building owned by a limited liability company in which they were the only members, improperly dividing the parties' assets and debts, and ordering Husband to pay a portion of Wife's attorney fees.

Specifically, Husband contends that: 1) the Marital Agreement was not in writing or "sufficiently spread upon the record"; 2) the Lease was not in writing and therefore "violate[d] the Statute of Frauds"; 3) the trial court had no evidence concerning the statutory factors governing the division of marital and nonmarital property as set forth in section 452.330;[2] 4) "the trial court divided assets of corporate entities not parties to the action" in violation of section 452.330; 5) "the judgment is unenforceable due to indefiniteness and uncertainty, in that it leaves unresolved execution of further documents such as [the Lease] and subjects the parties to possible civil contempt for breach of lease"; and 6) an award of $2,500 in attorney fees is improper as "the underlying judgment on which the fees are awarded is in error."[3]

After Husband filed his appeal, Wife moved to dismiss it, asserting that Husband had accepted the benefits of the judgment and was thereby barred from challenging it. Husband filed suggestions in opposition to Wife's motion. We then designated the motion as "taken with the case." Finding merit in Wife's motion to dismiss, we grant it and dismiss Husband's appeal.

### Facts and Procedural Background

Our summary of the relevant facts is presented in accordance with the requirement that we view all evidence and inferences in the light most favorable to the judgment, disregard all contrary evidence and inferences, and defer to the trial court all assessments of witness credibility. *See Holtgrewe v. Holtgrewe,* 231 S.W.3d 233, 235 (Mo.App. E.D.2007).

In July 2007, Husband and Wife separated after approximately twenty-five years of marriage. Wife filed for divorce the following June. On the morning of

---

1. This case was assigned for trial before the Honorable Sue Chrisman, a commissioner of the Family Court division of the circuit court. The dissolution judgment, which adopted Commissioner Chrisman's recommended findings and judgment, was executed by associate circuit judge Jason Brown. Commissioner Chrisman and Judge Brown will be referred to collectively as "the trial court."

2. All statutory references are to RSMo 2000.

3. Husband does not contest the amount of the fee awarded.

trial, March 8, 2010, the parties and their attorneys engaged in last-minute negotiations that produced an agreement ("the Marital Agreement"). The parties then announced to Commissioner Chrisman that they had settled the case. Wife presented evidence on the record supporting her petition and the terms of the Marital Agreement.

Wife's testimony was as follows. During the marriage, the parties had formed a corporation named "JAM Lead Solutions, LTD" ("JAM Lead"). JAM Lead operated a "call center" that worked in association with Husband's employment in the insurance industry. Wife managed the call center. Husband was to receive all of the stock of JAM Lead, which the parties valued at $338,000. Both the call center and Husband's insurance office, where he worked as a branch manager for Liberty National Insurance Company, were in an office building located on Bradford Parkway in Springfield ("Bradford Parkway"). Bradford Parkway was owned by JAM Enterprises Investments, LLC ("JAM Enterprises"). The parties were the sole members of JAM Enterprises, and its financial activities were addressed in their personal tax returns. In regard to the Lease—the main part of the Marital Agreement Husband challenges on appeal—Wife's testimony was as follows.

Q. And so you're going to receive that property, which is shown at JAM—excuse me—that is shown on East Bradford Parkway?

A. Yes.

Q. And [Husband], who—will operate his office for the insurance agency out of Bradford Parkway and the call center out of Bradford Parkway?

A. Yes.

Q. And he's going to lease the entire space that Bradford Parkway has there?

A. Yes.

Q. It's around 10,000—maybe a little over 10,000 square feet?

A. Yes.

Q. He's agreed to execute and personally guarantee a five-year lease on that property?

A. Yes.

Q. Beginning March 1, 2010?

A. Yes.

Q. At $11 a square foot?

A. Yes.

Q. And a triple net lease?

A. Yes.

Q. And that includes then [that] he'll pay the real estate taxes?

A. Yes.

Q. The insurance?

A. Yes.

Q. And the repairs and maintenance to the common area and to the building itself?

A. Yes.

Q. And we also agreed that he could have the right to sublease to reasonable tenants?

A. Yes.

Q. And that would be paid on a monthly basis?

A. Yes.

Q. And that's an important part of this, because this is a very valuable piece of property and right now your two businesses are-the insurance agency office and then the call center operate out of this location?

A. Correct.

Q. You'll be responsible for the mortgage on that particular piece of property, correct?

A.  Yes.

The division of other assets and debts included a lump-sum payment of cash from Husband to Wife of $200,000 and other periodic payments from Husband to Wife totaling $101,285.  These payments were agreed to in order to achieve an approximate 50/50 split of the net marital assets.  Wife was not requesting maintenance because the marital property she would be receiving, particularly Husband's monthly lease payments, would enable her to pay her bills even though she would no longer have the income she had earned by managing the call center.

Wife answered, "Correct," when her attorney asked if "it's your intentions that this be either entered into a marital settlement agreement of some kind signed by both of your [sic] and failing that, that [the trial court] will enter an order dividing the property and making the orders according to the evidence that [it has] heard here today?"  Wife then testified about her understanding of what would happen next.

Q.  So you understand [the trial court] may enter such orders as [the trial court] thinks carries out the division of this property and allocation of debts and maintenance, attorney fees and those issues, correct?  .

A.  Yes.

Q.  And you're asking that [the trial court] [do] that if you all can't come to a written contract as such?

A.  Correct.

Q.  Now, the lease agreement is one of those deals where when we talk about it in general terms, everybody understands what the lease agreement is going to be, but when we get to writing it down on paper, it is going to be that there—you're renting this property to him under the terms we've suggested with common terms for a commercial lease

and that if he defaults, you have certain rights and remedies against him, correct?

A.  Correct.

Wife's counsel next called Husband as a witness.  Husband confirmed that he "heard [Wife and her counsel] try to discuss the division of the property and the allocation of debts in this case[.]"  Husband also agreed that he had seen a list of the parties' assets and debts as prepared for Wife and he had nothing to add to it.  Husband's testimony about the Marital Agreement and the Lease was as follows.

Q.  You also have heard the testimony about the procedure of the case, the negotiation to try to reach a resolution between the two of you-between [Wife] and yourself.  And we have spent some significant time here this morning trying to put that settlement together, correct?

A.  Correct.

Q.  And do you believe that the division of the property and the debts is fair and reasonable?

A.  I do.

Q.  And are you asking [the trial court] to approve that agreement?

A.  Yes, sir.

Q.  And a part of it all depends upon this lease of Bradford Parkway, correct?

A.  Yes.

Q.  And you agree to lease that in the name of your company, but if you don't lease it individually that you'll personally guarantee the commercial lease?

A.  Yes.

Q.  And it'll be a five-year lease?

A.  Yes.

Q.  For all the space?

A.  Yes.

Q. At $11 a square foot?

A. Yes.

Q. And it's a triple net lease where you pay real estate taxes, insurance, repairs and maintenance in common areas?

A. Yes.

Q. And of course, you'll pay your own utilities?

A. Yes.

Q. And that payment will begin May— excuse me—April 1, 2010, as long as you take care of paying the mortgage for March 2010?

A. That's correct.

Q. As far as the transition of the call center from [Wife] to yourself, that's not that great big of a problem because you've sort of kept track of where the call center is financially?

A. Yes, sir.

Both attorneys then questioned Husband about his understanding of other aspects of the Marital Agreement, including the cash payments he would be making to Wife. During the course of questioning, Husband answered, "Yes, ma'am" when his own attorney asked him, "Are you asking the Court to approve the settlement as has been set out on the record thus far?"

The trial court inquired whether the parties wished to formalize the Marital Agreement in a judgment or a marital settlement agreement. Wife's attorney suggested that a marital settlement agreement would be preferable in an effort to preserve as much privacy for the parties as possible "but failing that, then we would just submit a judgment[.]" Husband's attorney stated that opposing counsel's suggestion was "acceptable."

On March 23, 2010, Wife filed a "Motion to Enforce Judgment." [4] Husband responded with a "Motion to Set Aside Settlement Agreement," and the parties were back before Commissioner Chrisman on March 30, 2010. A new attorney was now representing Husband and informed the commissioner that his client believed "there was a mistake made in the record as to referring to 10,000 square foot [sic] at the East Bradford Parkway building being leased by [Husband]." Counsel reported that Husband "has no ability to lease the 5,000 foot [sic] that Liberty Mutual [sic] occupies and hasn't leased before. He is not the owner of Liberty Mutual [sic]." Husband's new counsel further reported that Husband had "no authority to bind them [Liberty National] to a lease" and he did "not have the financial wherewithal to pay a 10,000 square foot lease at $11 a foot on this building."

Wife's counsel responded that the testimony at the hearing demonstrated that both parties wanted the trial court to approve the Marital Settlement and "the transcript is clear that [Husband] was going to lease the entire space" for five years and for that reason Wife had agreed not to seek maintenance. Wife's counsel reported that the draft settlement agreements exchanged between the parties after trial differed as to the amount of space to be

---

4. Wife's motion was inaptly named as no judgment had been entered at the time of its filing. But we are not limited to a motion's title and may consider its substance. *Cf. In re Marriage of Echessa*, 74 S.W.3d 802, 803 n. 1 (Mo.App. S.D.2002) (where a motion for rehearing was treated as a motion for new trial). Here, the motion states that Husband refused to execute the "Marital Settlement Agreement and Lease Agreement" as agreed during the March 8, 2010, hearing and asks either that Husband execute the documents or that the trial court "enter Judgment in accordance with the terms of the Marital Settlement Agreement and Lease Agreement." We find that the substance of the motion alternatively sought a judgment consistent with the terms of the Marital Settlement.

leased and who would make the March mortgage payment on the property. Wife's counsel also asked "for reasonable attorney fees, and at this time, that's around $2,000 to do all this fussing about what they agreed to" on the morning of trial and then spread on the record.

Commissioner Chrisman announced that she would review the transcript provided by Wife's counsel.[5] Later that day, she entered a docket entry finding "that there was a clear and unambiguous agreement that [Husband] was to lease the entire 10,000 plus square foot building on Bradford Parkway—triple net, for five years."[6]

At a hearing on April 20, 2010, the commissioner heard argument on Husband's "Opposition to Entry of Judgment." A statement for Wife's attorney fees was admitted as Exhibit 101 after Husband's counsel stated that there was no objection "to the authenticity of his fee." Commissioner Chrisman took the matter under advisement to review case law cited by Husband. On May 11, 2010, the trial court entered the judgment Husband now appeals.

The judgment awarded the call center to Husband and Bradford Park to Wife, ordered the execution of the necessary company resignations, stock assignments, and deeds to effectuate these awards, and divided and allocated the parties' other property and debts. The judgment also stated:

Commencing on April 1, 2010, [Husband] and/or JAM LEAD SOLUTIONS, LTD. shall lease from [Wife] and/or JAM INVESTMENTS, LLC [sic] the entirety of the property located at [ ] E. Bradford Parkway, Springfield Missouri, [legal description stated]. This commercial lease shall be for a period of five years. The lease shall be a "TRIPLE NET LEASE." The cost of this lease shall be at the rate of $11.00 per square foot for the entire space of the property at [ ] E. Bradford Parkway, which is estimated to be approximately 10,000 square feet. [Husband] will have the right to sublease to reasonable tenants, but he shall personally guarantee all rental payments due under this lease. [Husband] shall be responsible for all insurance and taxes during the term of the lease. [Husband] shall be responsible for maintenance and repairs of the building and common areas for the term of the lease. [Husband] shall pay the utility expenses on the building at [ ] E. Bradford Parkway. The lease payments are due on the first day of each month commencing April 1, 2010, and continuing for a term of five years.

On Wife's request for attorney fees incurred after the March 8, 2010 hearing, the judgment provided:

Each party shall pay their own attorney fees, except that [Husband] shall pay [Wife's] attorney fees for the costs of bringing a Motion to Enforce Judgment in the total amount of $2,500.00. This shall be payable within sixty days of the date of this Judgment. [Wife] shall have a judgment against [Husband] in the amount of $2,500.00 (Two Thousand

---

5. We cannot tell from the record whether this transcript was certified, but Husband makes no claim on appeal that Commissioner Chrisman should not have considered it based on any claim that it was not accurate or was not properly certified.

6. The docket entry further stated that "[Husband] was to pay March [sic] mortgage payment and his lease was to begin April 1, 2010." The trial court ordered Husband to pay the March mortgage payment "immediately" and set a hearing on "[Wife's] request for attorney fees and [c]larification of [p]aragraph 25 of [Wife's] [p]roposed [j]udgment." Paragraph 25 addressed a waiver of claims by Husband and Husband's companies against Wife.

Five Hundred Dollars). Execution is stayed for sixty days.

In support of her motion asking this court to dismiss Husband's appeal, Wife attached as Exhibit A her sworn affidavit. In her affidavit, Wife swears that "[f]ollowing the entry of the Judgment and Decree of Dissolution of Marriage dated May 11, 2010, [Husband] has been in possession of and control of the entire 10,000 square feet of [Bradford Parkway][,]" Wife has been deprived of use of the building, and she has received no income from the building other than Husband's lease payments. She further affied that Husband took control over the call center, took possession of the assets of the call center, received all the checks coming into the call center, and transferred the bank accounts for the call center. Husband also excluded Wife from the call center and fired a call center employee who had previously been hired by Wife. Wife also swears that she has "been unable to freely access the office building to perform repairs and inspect the premises as owner of the property without complaints and protest by [Husband], despite [Husband's] position that he agreed to lease only half of the space of the office building." Husband "additionally took possession and control of all assets awarded to him in the [j]udgment that he now disputes." Regarding other property awarded to Husband under the Marital Agreement and judgment, Wife affies that Husband "has taken the farm awarded to him in the [j]udgment, the cattle, income from hay sales, all machinery and equipment, income from his insurance business and the bank accounts awarded to him in the [j]udgment[.]"

Husband has not contested the testimony set forth in Wife's affidavit. And during one post-settlement hearing, Husband's counsel informed the trial court that Husband had paid wife $146,000 of the cash owed to her under their agreement. In his suggestions opposing Wife's motion to dismiss the appeal, although Husband disputes the voluntariness of his actions, Husband confirms his compliance with the judgment, stating:

> [Wife] does not dispute that she has received all lease payments and other monetary amounts due her under the judgment. The parties may be responsible for returning (as they would in any case of reversal) monetary amounts and personal property received by them pursuant to execution of the judgment.

After the judgment was entered, and while Husband's motion for rehearing was pending before Judge Brown, Wife filed a motion for contempt based on Husband's payment of only one-half of the ordered lease payments for April, May, and June; his payment of only a portion of the utilities; and his failure to make the first periodic cash payment required to eventually equalize the division of assets. A show cause order was entered on June 17, 2010, and an evidentiary hearing was set for September 14, 2010. Husband's notice of appeal was filed on July 1, 2010.

### Analysis

A party is estopped from appealing a judgment entered at his request. *Strawhun v. Strawhun*, 164 S.W.3d 536 (Mo. App. S.D.2005). One such example is *In re Marriage of Echessa*, where husband "fully understood and comprehended the terms and conditions of the stipulated settlement he entered into" and we found he could not "now appeal from a judgment that he previously agreed to." 74 S.W.3d at 807.

A party may also "be estopped from taking an appeal by performing acts after rendition of the judgment which are clearly inconsistent with the right of appeal." *Southern Missouri Dist. Council of*

*the Assemblies of God, Inc. v. Kirk,* 334 S.W.3d 599, 601 (Mo.App. S.D.2011). "Generally, a litigant who voluntarily accepts the benefits of an order, decree, or judgment of a court cannot afterwards prosecute an appeal to reverse it." *Millman v. Millman,* 278 S.W.3d 718, 726 (Mo. App. E.D.2009).

> The reason for the rule is that a party cannot proceed to enforce and have the benefit of such portions of a judgment as are in his favor and appeal from those against it-in other words, the right to proceed on a judgment and enjoy its fruits and the right to appeal therefrom are totally inconsistent positions, and the election to pursue one course must be deemed an abandonment of the other.

*Hicks v. Hicks,* 859 S.W.2d 842, 845 (Mo. App. W.D.1993).

Although "courts have not strictly applied this general rule of waiver in marital dissolution cases 'because of the peculiar situations of the parties and the equitable considerations involved,' " *Royalty v. Royalty,* 264 S.W.3d 679, 688 (Mo.App. W.D. 2008) (quoting *Reynolds v. Reynolds,* 861 S.W.2d 825, 828–29 (Mo.App. E.D.1993)), this room for lenience does not mean that an appeal of a dissolution judgment should never be dismissed when the appellant has accepted the benefits of the judgment. We "must consider all relevant circumstances on a case-by-case basis." *Millman,* 278 S.W.3d at 726; *see also Hicks,* 859 S.W.2d at 845–46(where wife was held to have waived her appeal as to the sale of property but "the equities of th[e] case" did not merit such a waiver as to the judgment's maintenance award).

The following factors, applied to the appealing party, have been considered an appropriate part of such an analysis:

> (1) the amount received was a small portion of the total judgment; (2) the amount accepted has effectively been conceded to be due by a [spouse] who did not appeal; (3) the acceptance of benefits was due to financial distress; (4) the absence of prejudice to the judgment debtor [spouse]; and (5) where the only issue on appeal is whether an award will be increased.

*Id.* at 845.

■ In his response to Wife's motion to dismiss the appeal, Husband, as earlier noted, does not specifically deny any of the content of Wife's affidavit. He instead asserts that he did not " 'voluntarily accept' the benefits of [the] judgment" because he complied with the judgment after Wife filed her motion for contempt. We also note that Husband's response to Wife's motion makes no claim that he accepted only a small portion of the benefits afforded him by the judgment[7] (the first exception); that he accepted the benefits of the judgment because he was under financial distress (the third exception); or that the only issue on appeal is whether the award will be increased (the fifth exception).

Husband argues it would be inappropriate for us to find that he voluntarily complied with the judgment because "[w]here [Wife] filed a Motion for Contempt to compel [Husband's] compliance with the judgment, it would be grossly inequitable to permit her to fault [Husband] for that very performance[.]" Although Husband now

---

**7.** The estimated net value of the marital estate was $4,656,060, and the parties intended to split the estate equally. The call center was listed on Exhibit 4 as an asset going to Husband with a value of $338,000. This represents approximately 15% of Husband's share of the net marital estate. It is also observed that the cattle operation and associated real estate conveyed to Husband by Wife was estimated to be worth a combined net value of $889,275 for approximately 38% of Husband's share of the marital estate.

argues that Wife's motion for contempt compelled his compliance, he acknowledges that he did not attempt to post a supersedeas bond pursuant to Rule 81.09.[8]

Rule 81.09 permits the presentation of such a bond to allow the appellant to avoid the execution of a judgment pending appeal. *See Southern Missouri Dist. Council of the Assemblies of God, Inc.*, 334 S.W.3d at 603 (where a claim that compliance was made in order to avoid contempt failed because appellant could have sought a supersedeas bond under Rule 81.09 or a stay of execution under Rule 76.25). Because Husband did not attempt to avoid compliance with the judgment by seeking approval of a supersedeas bond, we find that his compliance was voluntary.

In regard to Husband's acceptance of Wife's compliance with the judgment, we find *Millman* instructive. There, the appealing wife argued that her case was like *Hull v. Hull*, 591 S.W.2d 376, 378–79 (Mo. App. W.D.1979)—where the appeal was held not to be barred despite the appellant's acceptance of $140,000 of the $182,000 awarded to her-because husband's transfer of property to her was voluntary, she did not make any demand for enforcement, and husband did not intend to contest the judgment himself.[9]

The Eastern District distinguished *Hull* as follows:

> Unlike *Hull*, where the parties proceeded to trial, [h]usband and [w]ife were found by the trial court to have reached a settlement. The parties placed the material terms of the settlement on the record. In this case, [h]usband paid to [w]ife what was owed by him at the times specified by the terms of the parties' settlement, as memorialized in the [a]mended [j]udgment.

*Millman*, 278 S.W.3d at 727. The Eastern District went on to find that the payments accepted by the appealing wife were not effectively conceded by husband, but resulted from negotiation and settlement of contested amounts. *Id.* at 728.

This case is more like *Millman* and *Echessa* than *Hull*. In large part, what Husband seeks to now avoid by appeal is the same part of the judgment-the Lease-that he has already benefited from. *See In re Marriage of Tennant*, 769 S.W.2d 454, 456 (Mo.App. S.D.1989). The trial court's judgment did not follow a contested trial; it followed the parties' own Marital Settlement as spread on the record via

---

8. All rule references are to Missouri Court Rules (2011).

9. The *Hull* Court discussed two particular circumstances: "first, because the payment was voluntarily made by the husband without intercession by the wife either to require the payment or obtain its distribution and, second, because the payment actually preceded by some ten days the entry of judgment in the case." The husband paid the $140,000 into the court after trial but before the judgment was entered and the circuit clerk paid the same to the wife. *Id.* at 378. The Western District stated that "[w]ere it not for the unusual sequence of entries by which partial benefits under the ultimate judgment were distributed to the wife, the authorities noted above could well operate to deny the wife concurrent opportunity to challenge the judgment and also enjoy its benefits." *Id.* at 379. *See also Brisco v. Brisco*, 713 S.W.2d 586, 591 (Mo.App. W.D.1986) (appeal not waived even though wife accepted the two payments ordered in the judgment from the husband because when she accepted the payments she also signed an acknowledgment of receipt stating that she preserved her right to appeal); *but cf. Southern Missouri Dist. Council of the Assemblies of God*, 334 S.W.3d at 603 (appellant waived right of appeal even though the surrender of property pursuant to the judgment was accompanied by a notice of an intent to appeal the judgment, the respondent intended to seek enforcement of the judgment, and the appellant complied with the judgment to avoid contempt proceedings).

testimony under oath after they had decided to end their dispute by negotiation instead of litigation.

Husband confirmed on the record that he heard Wife's testimony as to the terms of the settlement, and he agreed that he would lease the entire space for five years at $11 per square foot. Wife testified that Husband's lease of the entire premises for five years was an important part of the Marital Agreement because the property was valuable, the call center and Husband's place of employment were housed in Bradford Park, and Wife would remain responsible for the mortgage on Bradford Park. Husband likewise confirmed that the Lease was an important part of the Marital Agreement.

Once the trial court issued its judgment, both parties began complying with its terms. Husband received the entire use of Bradford Park (including the portions not occupied by the call center which he was free to sublet), took exclusive control of the call center, and kept all the income it produced. Although the precise date of Wife's transfer of the call center and other acts of compliance with the judgment cannot be clearly determined from the record, Husband did not file his notice of appeal until after Wife filed her motion for contempt. As in *Millman*, this is not a case involving the payment of an uncontested amount by a party not appealing the judgment, 278 S.W.3d at 728, nor is it a case where the appealing party had no choice but to comply with the judgment; Husband could have attempted to stay any enforcement of the judgment by means of a supersedeas bond.

Wife asserts that she "changed her position for the worse in reliance on the representation and conduct of [Husband]." Husband counters Wife's claim by arguing that Wife "has received all lease payments and other monetary amounts due her un-der the judgment." In *Millman*, the appealing wife argued that husband could not have been significantly prejudiced by his own compliance with the judgment because he had other assets. *Id.* at 730. The *Millman* court held that while the financial consequences for husband may not have been "severe or crippling," his efforts to transfer property, change residences, and find new furnishings still cost money and "represent[ed] a substantial alteration in one's life situation[.]" *Id.* The same is true here. All changes in the position of the parties were based on their settlement agreement as memorialized in the judgment. The record does not reflect what, if any, sums Wife paid for the preparation of the documents to be used to transfer the assets, but at the very least she could no longer work where she had previously worked, she was no longer receiving any income from the call center, and her access to her own building was restricted to that of a landlord. The negative changes in Wife's position that resulted from her compliance with the Marital Agreement were "not inconsequential." *See Id.* Husband has failed to demonstrate that Wife suffered no prejudice.

There is no escaping the fact that Husband has taken inconsistent positions regarding the judgment. On the one hand, he asked the trial court to approve the Marital Agreement, accepted at least control if not ownership of assets that were a significant part of the Marital Agreement as memorialized in the judgment (including the benefits of the Lease), and made substantial cash payments to Wife in accordance with Marital Agreement instead of attempting to post a supersedeas bond to stay the judgment after it was entered. On the other hand, he is attempting to reverse the judgment. As no exception to the waiver rule appears, he cannot do both.

142

Husband's appeal is dismissed.[10]

BARNEY, P.J. and LYNCH, J., concur.

---

10. Even if we had found it appropriate to address Husband's allegations of error, he would not have prevailed. His chief complaint—that he did not understand that he was agreeing to lease all 10,000 sq. ft. of Bradford Parkway instead of just the approximately 5,000 sq. ft. then being occupied by the call center—is clearly refuted by the record. Commissioner Chrisman's finding that Husband knew perfectly well what he was agreeing to on the morning of trial was supported by substantial evidence. It was well within her discretion to believe, perhaps, that the pan, once removed from the fire of an impending trial, may later forget the feel of the flame and begin to wax cool about the wisdom of its fire-forged bargain.